**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------×
RODRIGO SALEM,

         *Plaintiff,*

    *v.*

META PLATFORMS INC.
BRIAN GROVES,
and AJAA LONG

        *Defendants.*
-------------------------------------------------------------------------×

<u>**COMPLAINT**</u>

<u>**1:22-cv-01073**</u>

<u>**JURY REQUESTED**</u>

    Plaintiff Rodrigo Salem, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendants Meta Platforms Inc., ("Meta" formerly and together "Facebook") Brian Groves, and Ajaa Long as follows:

<u>**PRELIMINARY STATEMENT**</u>

    1.    This case is about the severe and pervasive race, national origin, disability, and sexual orientation discrimination of a senior and long-term Meta employee and Meta's wholesale failure to provide reasonable accommodations.  In short, Meta champions the careers of its white American employees who do not have disabilities and marginalizes and terminates the employment of those who are not white, non-native English-speaking Americans free of disabilities.  Plaintiff Rodrigo Salem was retaliated against for engaging in a protected activity under Title VII, 42 U.S.C. § 2000e-3(a) and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 and related provisions in the New York State Human Rights Law and New York City Human Rights Law.

    2.    Salem was subjected to a hostile work environment perpetuated by his superiors, penalized, and discriminated against on the basis of his gender, sexual orientation, race, national origin, and disability status.

3.     Meta failed to engage the interactive process when Salem repeatedly put his managers on notice regarding multiple disabilities and related impediments they created.

4.     Brian Groves and Ajaa Long, Plaintiff's managers and supervisors, repeatedly and frequently discriminated against Plaintiff on the basis of race, national origin, and disability status, and created and/or perpetuated a work environment hostile to those traits.

## JURISDICTION

5.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims, as they arise under Title VII, 42 U.S.C. §2000 *et seq*., and the ADA, 42 U.S.C. § 12101, *et seq*.

6.     Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over Plaintiff's claims because all the parties are residents of separate states and there is complete diversity.

7.     Pursuant to 28 U.S.C. § 1367, this Court has original jurisdiction over Plaintiff's State claims because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

## PARTIES

8.     Plaintiff was and is a resident of New York, New York.

9.     Defendant Meta Platforms, Inc. was and is a business incorporated under the laws of the State of Delaware with a headquarters at 1601 Willow Road Menlo Park, CA 94025.

10.     Defendant Brian Groves was and is a resident of the State of Connecticut.

11.     Defendant Ajaa Long was and is a resident of the State of New Jersey.

## JURY DEMAND

12.     Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

13.     Salem began working for Meta in 2012 when the company was known as Facebook, Inc., and any reference to Meta will incorporate this time when the company was known as Facebook, Inc (collectively "Meta").  All Defendants are hereinafter collectively referred to as "Meta" and/or Defendants.

14.     Salem has been an exceptional employee with increased business and managerial responsibility receiving one promotion, substantial salary increases, and/or exceedingly positive employee evaluations throughout the term of his employment at Meta.

15.     Salem is an openly gay Latino man who is HIV positive.  He also has ADHD and a hearing impairment.

16.     In or around August 2016, Salem received a promotion to an individual contributor level 7 position for his positive contributions to Meta.

17.     In October 2016, Salem applied to the Global Client Lead role for ABI- INBEV in the Global Client & Category team.

18.     The interview panel included several members of Meta's Global Client & Category team leadership including Brian Groves, Director of Consumer-Packages Goods, hiring manager Mike Harp, and two additional interviewers.

19.     Salem did not get the position, nor did he receive immediate feedback, which Groves interviewed him for.

20.     In or around February 2017, Salem received an "exceeds expectations" performance rating, which is the third-best rating in Meta's scale.

21.     In or around April 2017, the ABI-INBEV hiring manager told Salem he did not get the Global Client Lead position because Brian Groves thought Salem was "too salesy and not strategic enough" for the role.

3

22.     In or around July 2017, Salem received a "redefines expectations" performance rating, Meta's pinnacle of performance ratings.

23.     In August 2017, Salem closed the first global deal with Estee Lauder Companies ("ELC") for $60,000,000.

24.     Under normal circumstances, this deal would have been negotiated by Groves' team.  Groves' team, however, was unable to close the deal, but Salem was able to establish the partnership and secure the contract.

25.     Salem closed this deal in his capacity as the Senior Client Partner for ELC in North America.

26.     In or around August 2017, Salem applied for the Global Client Lead for ELC.

27.     Around this time, a member of the Global Client & Category Team, who worked closely with Groves, privately told Salem he should not get his hopes up about this new position because Groves does not like him and resents the fact that Salem was the one to close the deal with ELC.

28.     After Salem successfully closed the deal with ELC, that client requested that Salem became the Global Client Lead for ELC and made it clear they did not want to work with anyone else except Salem in the role.

29.     In October 2017, Salem was appointed to the role of Global Client Lead for ELC and joined the team led by Groves.  At this stage, Salem reported directly to his supervisor, Tawana Burnett, who in turn reported to Brian Groves.  Salem was the only gay Latino with a strong accent within the Global Client and Category Team.

30.     In or around November 2017, Burnett told Salem that Meta's leadership, specifically Groves and Will Platt-Higgins, Groves' manager, harbored preconceived biases against Salem.

31.     Burnett offered to support Salem in working with leadership to correct their unfounded preconceived biases against him.

32.     In or around May 2018, Salem told Burnett, who had a more senior position over Salem, that he has ADHD and a hearing impairment.  Salem asked for certain accommodations, including post important meeting debriefs with her to go over what was discussed.

33.     Although Burnett granted Salem's requests to meet with him after important meetings, she never disclosed this conversation with Human Resources nor Employee Relations.

34.     Though Burnett gave Salem accommodations for a time, her failure to inform Meta of the accommodation request prevented Salem from engaging in the interactive process.

35.     In or around January 2018, Salem received a "meets all expectations" performance review.

36.     In or around September 2018, at an offsite event as part of Burnett's "Bring Yourself to Work" initiative, Salem told Burnett, the audience of twenty employees, and Human Resources that he is HIV positive and has ADHD.  Salem received no offer of support from Human Resources.

37.     Between January and July 2019, Salem received two additional "greatly exceeds expectations" performance reviews, which is the second-best rating in Meta's rating scale.

38.     In August 2019, Salem successfully negotiated another Global Deal with ELC for $115,000,000.

39.     In October 2019, Burnett was promoted to a new role in Singapore.

40. Prior to leaving her position under Groves and as supervisor to Salem, Burnett told Salem that she will no longer be able to "protect him" from Groves and that Salem should consider leaving the team. When Salem asked for more feedback, Burnett told him that leadership, meaning Groves, does not believe he is a good fit for the role and she was unable to provide additional details.

41. In November 2019, Brett Prescott, one of Salem's peers, became his interim manager. Brian Groves became directly involved in the ELC partnership, interacting frequently with Salem and, ultimately, supervising him.

42. Salem explicitly told Groves that he has ADHD and a hearing impairment.

43. Salem told Groves about his disabilities which had previously led Groves to perceive Salem as "loud, intense, and abrasive.".

44. Salem told Groves that his former supervisor, Burnett, agreed to meet with him after important meetings to debrief. Salem told Groves that these meetings were helpful to him because he continued to struggle with ADHD and a hearing impairment.

45. Salem requested that Groves accommodate his disabilities by requesting to meet with him after client meetings.

46. Groves did not accommodate Salem's request at any point.

47. Additionally, Groves never engaged in the interactive process with Salem to ask about his needs as a disabled employee, and never disclosed their conversations to Human Resources nor Employee Relations.

48. In or around January 2020, Salem received his first "meets most expectations" performance review. This is a lower performance review than Salem received in the past, specifically, when Burnett was 'shielding' Salem from Groves' discriminatory treatment.

49.     In February 2020, Salem made a public post on his social media accounts about his hearing impairment, his use of a hearing aid, and general challenges he faced when he first began to openly speak about his disability.

50.     Groves, his then interim manager, commented on the post: "Congrats Rod on taking this step."  Meta's Human Resources and Employee Relations were still not put on notice about Salem's disabilities.

51.     In or around April 2020, Meta hired Ajaa Long as the new Global Beauty Lead. Salem began to report directly to Long who, in turn, reported to Groves.

52.     At the beginning of their work relationship, Salem informed Long, his new supervisor, about his ADHD and hearing impairment.  Salem also told Long that Groves and other members of the leadership team previously perceived him as loud, intense, and abrasive.

53.     Salem explained that his ADHD and hearing impairment might make him appear to be loud, intense, or abrasive, but that he did not intend to be.

54.     Salem made the same request to Long that he made to Burnett and Groves, his two previous supervisors.  Salem requested that Long accommodate his disabilities by meeting with her after client meetings to debrief when necessary.

55.     Long would not accommodate Salem's request.

56.     Between 2020 and 2021, Long repeatedly talked over Salem during team meetings and cut several of his presentations short with little to no feedback.

57.     In numerous meetings between Salem and Platt-Higgins, Groves, and Long, the leaders overseeing Salem, repeatedly appeared disinterested, "checked out," and vague when meeting with him.

58.     Leadership repeatedly failed to actively listen to Salem on several occasions before Employee Relations began their investigation into Salem's claims.

59.     In July 2020, Long improperly managed communications with ELC in the wake of Facebook's Media Boycott.  ELC asked Salem to reassume executive communications with ELC.

60.     Salem accepted this request and persuaded ELC not to join the boycott against Facebook saving Meta more than 5 million dollars in ad revenue.  ELC was one of the few Global advertisers who didn't join the boycott.

61.     In the wake of COVID-19, the ELC partnership failed to hit their investment commitment by 15% just as most, if not all, advertisers.  The partnership began to lose internal momentum and leadership, specifically Groves, blamed Salem.

62.     In August 2020, Salem successfully negotiated another Global Deal with ELC for $100,000,000 despite the negative effects of COVID-19 on the advertising market.

63.     In August 2020, Salem did not receive a performance rating because of COVID-19 related delays.  However, Long documented that Salem lacked 'stakeholder management skills, thought leadership and was not building community within Facebook despite all evidence showing the contrary.  Not only was this unfair treatment, but it was an ongoing practice by Groves and Long to solely focus on subjective, intangible considerations rather than how well the partnership and the business was doing, which at the time, due to the pandemic, had understandably slowed down, something beyond Salem's control.

64.     In or around September 2020, in a 1:1 meeting with Salem, Long told Salem, "I cannot understand you," implying that she could not understand Salem because of his accent.

65.     In October 2020, Long stated that "meetings with the ELC team are always so intense," and asked Salem, "Why are you so intense?"

66.     Salem once again reiterated that Long's perception of him as "intense" at ELC team meetings was likely due to his ADHD and hearing impairment, which caused him to speak loudly at times.

67.     Salem had previously disclosed his disabilities to Long in a conversation at the start of their working relationship.

68.     Salem asked Long to take his disabilities into account before making such disparaging comments in the future, but Long was uninterested in respecting this request.

69.     In January 2021, Salem's former manager Burnett called him to let him know that Groves and Platt-Higgins wanted to fire him and that he should begin looking for another job.

70.     In February 2021, Salem received his second "meets most expectations" performance review despite outstanding results.  Long's feedback was vague and ambiguous when Salem requested a discussion on the matter.

71.     In February 2021, Salem attempted to dispute his unfair performance rating and requested an investigation into the toxic work culture he experienced under Groves in a conference call with Gerald Isaac from Employee Relations.

72.     Salem once again informed Employee Relations about his disabilities, a fact which his previous managers knew for several years.

73.     Isaac elevated the case to manager Marinella Sanchez.

74.     Employee Relations told Salem that he could be terminated at any time or cannot be transferred to a different role, since he had received two "meets most expectations" performance reviews at this point.

75.     Meta offered Salem a severance package.  Salem declined.

76.     Salem followed up with Sanchez and reiterated his complaints.

77.     Salem sent a PowerPoint to Employee Relations explaining his complaint and highlighting the challenges of having his ADHD and hearing impairment.  Employee Relations did not acknowledge Salem's disabilities and only responded once Salem brought a complaint about discrimination based on his HIV positive status.

78.     As per standard protocol, Platt-Higgins was notified by Employee Relations about the pending internal investigation into Salem's claims.

79.     In or around March 2021, Salem told the Meta investigator that he was mistreated because of his disabilities and that he did not receive adequate support from his managers even though he disclosed his disabilities to Burnett, Groves, and Long on multiple, separate occasions.

80.     Salem reiterated that he was repeatedly picked on and mistreated by Groves and Long in the workplace after he disclosed his disabilities to them.

81.     In May 2021, Rachel Cohn, a former Global Accounts & Category Team employee who previously reported to Brian Groves and was forced to transfer to another team, reached out to Salem offering to help with the investigation.  She told Salem that "there are many others who have had negative experiences with Brian Groves" and that "Brian is a tyrant, a racist."  Cohen also told Salem that Brian Groves' pre-conceived bias were documented on the interview feedback tool from when Salem applied to the ABI-INBEV GCL role and suggested he bring that up in the investigation.

82.     Cohen gave Salem the names of nine (9) others who had negative experiences under Groves.

83.     Cohen gave the names of two former and seven current Meta employees who've experienced mistreatment under Brian's leadership. The two former employees are Cintia

Gabilano and Mike Harp.  The seven current employees are Adrian Adaramoye, Brett Prescott, Matt Strief, Jay Ferguson, Pablo Surace, Natalia Mazuchelli and Kim Kane.

84.     Salem established contact with Adaramoye, Prescott, Strief, Ferguson, Surace, and Mazuchelli and they shared their complaints about the toxic culture perpetuated by Groves.

85.     On June 7, 2021, Salem publicly posted on Facebook Workplace about his disabilities and the importance of being open about one's disabilities with managers and employers.

86.      In the post, Salem described the positive show of support he received from his former supervisor, Burnett, after he disclosed his HIV status and disabilities to her.

87.     Several hours later, Employee Relations and leadership aggressively demanded Salem remove a specific portion of the post which they perceived as implying that Salem's current manager, Long, did not support him.

88.     Employee Relations told Salem that if he failed to alter his post, they would consider his post an aggression against Meta and repercussions would soon follow.  Salem altered his post as ordered to do so by Meta.

89.     In June 2021, Meta concluded its investigation of Salem's claims of a toxic workplace and told Salem there was no case.  Meta only contacted three of the seven employees Salem named to Employee Relations regarding Groves' discriminatory treatment.  Meta also said they did not find any evidence of Brian Groves' preconceived bias in the interview feedback tool.

90.     Meta offered Salem a severance package for the second time.  Salem declined.

91.     In June 2021, Salem was invited to be a keynote speaker at ELC's LGBTQ Global Pride Summit WELCOME and shared with his ELC partners that he is HIV positive, to normalize the topic in the workplace, with the consent of his clients.

92.     In July 2020, Salem negotiated the biggest Global Deal with ELC for $170,000,000. ELC's leadership congratulated Meta's management for Salem's leadership driving the partnership.

93.     In August 2021, Salem received another "meets most expectations" performance rating.  The feedback he received from ELC clients and his peers, who supported and approved of Salem, and his supervisors at Meta were remarkably different from one another.

94.     Salem attempted to dispute this performance review with Employee Relations. Employee Relations discouraged Salem from doing so and told him the employee rating was final.

95.     In August 2021, Groves received a promotion.

96.     Also in August 2021, Salem was invited to participate at Meta's LGBTQ Pride Global Summit and present a workshop about being HIV positive.

97.     In September 2021, Long met with Salem and acknowledged Salem's positive performance progress during the most recent session.

98.     Later in September 2021, Salem met with Groves to have a candid discussion about his work performance. Groves acknowledged that he is happy with Salem's improved work performance.

99.     One day prior to the summit, which was to take place on September 22, 2021, Meta cancelled Salem's HIV workshop without explanation.

100.    This cancellation, however, seemed to have been building for some time, as in October 2021 Meta, through its Employee Resource Group, told Salem that the "audience was too small" to entertain supporting employees who are HIV positive and HIV positive allies.

101.    At the time of his termination, there were two hundred (200) members in the support group Salem created, Poz@facebook, and he had moderated a Meta panel on HIV which had over fifty (50) attendees.

102.    Both clearly indicate that the audience was not "too small," and, regardless, Meta's lack of interest in supporting these HIV positive, disabled employees is reprehensible.  In fact, another Meta employee, an attorney in Meta's legal department who is HIV positive, expressed to Salem that Human Resources would not give him guidance about creating an internal HIV community.

103.    On December 1, 2021, Salem met with Marne Levine, Meta's Global Client and Category Team's Chief Business Officer, and Jane Lauder, ELC's Chief Marketing Officer, and reported a successful meeting with the ELC partners.  Long was also present in the meeting without an active role.

104.    On December 3, 2021, Marne Levine sent Jane Lauder a gracious thank you email.

105.    Jane Lauder replied to Marne Levine and highlighted the great work accomplished by Salem's team.

106.    On December 6th, 2021, and without notice, Meta terminated Salem after nearly ten years of employment.

107.    Salem was terminated three weeks before finishing the quarter; that quarter was ELC's highest ever investment quarter.

108.    Meta told Salem, "Leadership does not think you have the strategic skills to manage the partnership" less than a week after his successful meeting with ELC leaders.

## CAUSES OF ACTION

### FIRST CLAIM

**Wrongful Termination Under the Americans with Disabilities Act**

109.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

110.    Plaintiff engaged in protected activity by notifying his supervisors, Brian Groves, Ajaa Long, Tawana Burnett, and Employee Relations about his disabilities.

111.    After doing so, Groves and Long continued to harass Plaintiff about traits associated with his disabilities.

112.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta, in whole or in part, fired Plaintiff because he was disabled.

113.    Plaintiff suffered damages as a result of Defendant Meta's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

114.    Defendant Meta intentionally violated Plaintiff's rights under the Americans with Disabilities Act, with malice or reckless indifference, and, as a result, is liable for punitive damages.

### SECOND CLAIM
**Wrongful Termination Under Title VII**

115.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

116.    Under Title VII, it is illegal to direct an adverse employment action against an employee because of their protected status, such as gender, race, or national origin.

117.    Termination is an adverse employment action and, when an employer terminates an employee because of their protected class status, that employee has a claim for wrongful termination.

118.    Plaintiff is an openly gay, HIV positive Latino man.

119.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta fired Plaintiff because of his protected statuses, individually and/or collectively.

120.    But for Plaintiff being an openly gay, HIV positive Latino man, he would not have been terminated.

121.    Plaintiff suffered damages as a result of Defendant Meta's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

122.    Defendant Meta intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

### THIRD CLAIM

**Wrongful Termination Under New York State Human Rights Law**

123.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

124.    Under the New York State Human Rights Law §296(1)(a), it is illegal to direct an adverse employment action against an employee because of their protected status, such as gender, race, sexual orientation, or national origin.

15

125.     Termination is an adverse employment action and, when an employer terminates an employee because of their protected class status, that employee has a claim for wrongful termination.

126.     Plaintiff is an openly gay, HIV positive Latino man.

127.     Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta fired Plaintiff because of his protected statuses, individually and/or collectively.

128.     But for Plaintiff being an openly gay, HIV positive Latino man, he would not have been terminated.

129.     Plaintiff suffered damages as a result of Defendant Meta's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

130.     Defendant Meta intentionally violated Plaintiff's rights under the New York State Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## FOURTH CLAIM

### Wrongful Termination Under New York City Human Rights Law

131.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

132.     Under Chapter 5 of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, any person aggrieved by discriminatory practices as set forth in Chapter 6 of the New York City Human Rights Law may bring a private action against that person or entity discriminating against them.

133.     Termination is an adverse employment action and, when an employer terminates an employee because of their protected class status, that employee has a claim for wrongful termination.

134.     Plaintiff is an openly gay, HIV positive Latino man.

135.     Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.   Defendant Meta fired Plaintiff because of his protected statuses, individually and/or collectively.

136.     But for Plaintiff being an openly gay, HIV positive Latino man, he would not have been terminated.

137.     Plaintiff suffered damages as a result of Defendant Meta's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits.   Meta's actions caused Plaintiff to face financial instability.

138.     Defendant Meta intentionally violated Plaintiff's rights under the New York City Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## FIFTH CLAIM

### Wrongful Termination Under New York City Human Rights Law

139.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

140.     Under Chapter 5 of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, any person aggrieved by discriminatory practices as set forth in Chapter 6 of the New York City Human Rights Law may bring a private action against that person or entity discriminating against them.

141. Termination is an adverse employment action and, when an employer terminates an employee because of their protected class status, that employee has a claim for wrongful termination.

142. Plaintiff is an openly gay, HIV positive Latino man.

143. Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless. Defendant Meta fired Plaintiff because of his protected statuses, individually and/or collectively.

144. But for Plaintiff being an openly gay, HIV positive Latino man, he would not have been terminated.

145. Defendant Groves discriminated against Plaintiff by giving him negative performance evaluations because of protected traits, such as race, national origin, and disability status, that led to Plaintiff's adverse employment action.

146. Plaintiff suffered damages as a result of Defendant Groves' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits. Groves' actions caused Plaintiff to face financial instability.

147. Defendant Groves intentionally violated Plaintiff's rights under the New York City Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## SIXTH CLAIM

### Wrongful Termination Under New York City Human Rights Law

148. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

18

149.    Under Chapter 5 of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, any person aggrieved by discriminatory practices as set forth in Chapter 6 of the New York City Human Rights Law may bring a private action against that person or entity discriminating against them.

150.    Termination is an adverse employment action and, when an employer terminates an employee because of their protected class status, that employee has a claim for wrongful termination.

151.    Plaintiff is an openly gay, HIV positive Latino man.

152.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta fired Plaintiff because of his protected statuses, individually and/or collectively.

153.    But for Plaintiff being an openly gay, HIV positive Latino man, he would not have been terminated.

154.    Defendant Long discriminated against Plaintiff by giving him negative performance evaluations because of protected traits, such as race, national origin, and disability status, that led to Plaintiff's adverse employment action.

155.    Plaintiff suffered damages as a result of Defendant Long's unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits.  Long's actions caused Plaintiff to face financial instability.

156.    Defendant Long intentionally violated Plaintiff's rights under the New York City Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## SEVENTH CLAIM

### Retaliation Under the Americans with Disabilities Act

157.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

158.     The Americans with Disabilities Act prohibits employers from retaliating against employees when they request accommodations.

159.     Plaintiff repeatedly asked Defendant Meta, through its qualified employees, that Defendant consider his disabilities and provide accommodations.

160.     Defendant Meta routinely refused to formally acknowledge those accommodation requests, but Defendant Meta's employees continuously harassed Plaintiff because of his disabilities.

161.     Defendant Meta's employees went out of their way to target Plaintiff for his disabilities by calling him harassing names, even after Plaintiff requested they acknowledge and accommodate him.

162.     Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta, in whole or in part, fired Plaintiff because he requested accommodations for his disabilities.

163.     Plaintiff suffered damages as a result of Defendant Meta's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

164.     Defendant Meta intentionally violated Plaintiff's rights under The Americans with Disabilities Act, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## EIGHTH CLAIM

### Retaliation Under Title VII

165.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

166.    Plaintiff engaged in protected activity by complaining to Employee Relations about the discriminatory work environment perpetuated by his supervisor, Brian Groves.

167.    Only ten (10) months after Plaintiff complained to Employee Relations about the discrimination and hostile work environment, and only six (6) months after Employee Relations concluded its investigation, Defendant summarily fired Plaintiff on December 6, 2021.

168.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta fired Plaintiff because he complained of race and/or national origin discrimination and/or because he complained about disability discrimination.

169.    Plaintiff suffered damages as a result of Defendant Meta's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

170.    Defendant Meta intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## NINTH CLAIM

### Retaliation Under the New York State Human Rights Law

171.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

172.    Under §296(7) of the New York State Human Rights Law, it is illegal for an employer to retaliate against an employee for engaging in a protected activity.

173.   Plaintiff engaged in protected activity by complaining to Employee Relations about the discriminatory work environment perpetuated by his supervisor, Brian Groves.

174.   Only ten (10) months after Plaintiff complained to Employee Relations about the discrimination and hostile work environment, and only six (6) months after Employee Relations concluded its investigation, Defendant summarily fired Plaintiff on December 6, 2021.

175.   Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless.  Defendant Meta fired Plaintiff because he complained of race and/or national origin discrimination and/or because he complained about disability discrimination.

176.   Plaintiff suffered damages as a result of Defendant Meta's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits.  Meta's actions caused Plaintiff to face financial instability.

177.   Defendant Meta intentionally violated Plaintiff's rights under New York State Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## TENTH CLAIM

### Retaliation Under the New York City Human Rights Law

178.   Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

179.   Under §8-107(7) of the New York City Human Rights Law, it is illegal for an employer to retaliate against an employee for engaging in a protected activity

180.   Plaintiff engaged in protected activity by complaining to Employee Relations about the discriminatory work environment perpetuated by his supervisor, Brian Groves.

181.    Only ten (10) months after Plaintiff complained Employee Relations about the discrimination and hostile work environment, and only six (6) months after Employee Relations concluded its investigation, Defendant Meta summarily fired Plaintiff on December 6, 2021.

182.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless. Defendant Meta fired Plaintiff because he complained of race and/or national origin discrimination and/or because he complained about disability discrimination.

183.    Plaintiff suffered damages as a result of Defendant Meta's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits.

184.    Defendant Meta intentionally violated Plaintiff's rights under New York City Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## ELEVENTH CLAIM

### Retaliation Under the New York City Human Rights Law

185.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

186.    Under §8-107(7) of the New York City Human Rights Law, it is illegal for an employer to retaliate against an employee for engaging in a protected activity

187.    Plaintiff engaged in protected activity by complaining to Employee Relations about the discriminatory work environment perpetuated by his supervisor, Brian Groves.

188.    Only ten (10) months after Plaintiff complained to Employee Relations about the discrimination and hostile work environment, and only six (6) months after Employee Relations concluded its investigation, Defendant Meta summarily fired Plaintiff on December 6, 2021.

189.    Defendant Meta's alleged reason for terminating Plaintiff's employment is pretextual and baseless. Defendant Meta fired Plaintiff because he complained of race and/or national origin discrimination and/or because he complained about disability discrimination.

190.    Plaintiff suffered damages as a result of Defendant Groves' unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits.

191.    Defendant Groves intentionally violated Plaintiff's rights under New York City Human Rights Law, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## TWELFTH CLAIM

### Disability Discrimination in Violation of the Americans with Disabilities Act

192.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

193.    Defendant Meta is an employer covered under the Americans with Disabilities Act.

194.    Plaintiff is disabled within the meaning of the Americans with Disabilities Act; his major life functions are impaired by his disabilities.

195.    Defendant Meta knew, through its senior employees, of Plaintiff's need and request for an accommodation, but failed to fulfill its duty to provide such reasonable accommodation.

196.    Plaintiff was able to perform his core job functions with or without accommodations.

197.    Plaintiff requested accommodations for his Attention Deficit Hyperactivity Disorder and hearing loss, by requesting debriefs after important meetings, from his supervisors, Tawana Burnett, Brian Groves, and later, Ajaa Long.

198.    Defendant Meta summarily failed to accommodate Plaintiff's request for an accommodation by failing to engage the interactive process.

199.    Defendant Meta's managers and high-level workers, Defendant Brian Groves, and Defendant Ajaa Long were blatantly aware of Plaintiff's disabilities, yet no Defendant ever made any formal move to engage the interactive process regarding Plaintiff's disabilities.

200.    Defendant Groves clearly acknowledged, on a Facebook Post, that Plaintiff had disabilities, yet never engaged Plaintiff regarding those disabilities.

201.    Plaintiff notified all Defendants about his disabilities. Defendants never returned any formal or informal response, information, or communication regarding those disabilities, and never accommodated Plaintiff.

202.    Defendant Meta violated the ADA when they failed to engage in the interactive process to learn more about Plaintiff's disability and requested accommodation.

### THIRTEENTH CLAIM

### Failure to Accommodate by Failing to Engage the Interactive Process in Violation of the New York State Human Rights Law

203.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

204.    Plaintiff is disabled within the meaning of §296(2) and (21) of the New York State Human Rights Law.

205.    Plaintiff has medically cognizable disabilities but can still perform his core job functions despite them.

206.    Defendant Meta knew, through its senior employees, of Plaintiff's need and request for an accommodation, but failed to fulfill its duty to provide such reasonable accommodation.

207.    Plaintiff requested accommodations for his Attention Deficit Hyperactivity Disorder and hearing loss, by requesting debriefs after important meetings, from his supervisors, Tawana Burnett, Brian Groves, and later, Ajaa Long.

208.    Defendant Meta summarily failed to accommodate Plaintiff's request for an accommodation by failing to have any deliberation over Plaintiff's disabilities and by failing to engage the interactive process.

209.    Defendant Meta's managers and high-level workers, Defendant Brian Groves, and Defendant Ajaa Long were blatantly aware of Plaintiff's disabilities, yet no Defendant ever made any formal move to engage the interactive process regarding Plaintiff's disabilities.

210.    Defendant Groves clearly acknowledged, on a Facebook Post, that Plaintiff had disabilities, yet never engaged Plaintiff regarding those disabilities.

211.    Plaintiff notified all Defendants about his disabilities, Defendants never returned any formal or informal response, information, or communication regarding those disabilities, and never accommodated Plaintiff.

212.    Defendant Meta violated the New York State Human Rights Law when they failed to engage in the interactive process to learn more about Plaintiff's disability and requested accommodations.

## **FOURTEENTH CLAIM**

**Failure to Accommodate by Failing to Engage in Cooperative Discussions over Plaintiff's Disabilities in Violation of the New York City Human Rights Law**

213.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

214.    Plaintiff is disabled within the meaning of §8-102(16) of the New York City Human Rights Law.

215.     Defendant Meta knew, through its senior employees, of Plaintiff's need and request for an accommodation, but failed to fulfill its duty to provide such reasonable accommodation.

216.     Plaintiff requested accommodations for his Attention Deficit Hyperactivity Disorder and hearing loss, by requesting debriefs after important meetings, from his supervisors, Tawana Burnett, Brian Groves, and later, Ajaa Long.

217.     Defendant Meta summarily failed to accommodate Plaintiff's request for an accommodation by failing to engage the interactive process.

218.     Defendant Meta was required to provide Plaintiff a written final determination regarding his disability accommodations, yet failed to do so.

219.     Defendant Meta's managers and high-level workers, Defendant Brian Groves, and Defendant Ajaa Long were blatantly aware of Plaintiff's disabilities, yet no Defendant ever made any formal move to engage the interactive process regarding Plaintiff's disabilities.

220.     Defendant Groves clearly acknowledged, on a Facebook Post, that Plaintiff had disabilities, yet never engaged Plaintiff regarding those disabilities.

221.     Plaintiff notified all Defendants about his disabilities.  Defendants never returned any formal or informal response, information, or communication regarding those disabilities, and never accommodated Plaintiff.

222.     Defendant Meta violated the New York City Human Rights Law when they failed to engage in cooperative discussions to learn more about Plaintiff's disability and requested accommodations.

## FIFTEENTH CLAIM

**Failure to Accommodate by Failing to Engage in Cooperative Discussions over Plaintiff's Disabilities in Violation of the New York City Human Rights Law**

223.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

224.    Plaintiff is disabled within the meaning of §8-102(16) of the New York City Human Rights Law.

225.    Defendant Groves knew of Plaintiff's need and request for an accommodation, but failed to fulfill his duty to provide such reasonable accommodation, or to engage in any cooperative discussions regarding those disabilities.

226.    Plaintiff requested accommodations for his Attention Deficit Hyperactivity Disorder and hearing loss, by requesting debriefs after important meetings, from Defendant Groves.

227.    Defendant Groves summarily failed to accommodate Plaintiff's request for an accommodation by failing to engage the interactive process.

228.    Defendant Groves was required to provide Plaintiff a written final determination regarding his disability accommodations, yet failed to do so.

229.    Defendant Meta's managers and high-level workers, Defendant Brian Groves, and Defendant Ajaa Long were blatantly aware of Plaintiff's disabilities, yet no Defendant ever made any formal move to engage the interactive process regarding Plaintiff's disabilities.

230.    Defendant Groves clearly acknowledged, on a Facebook Post, that Plaintiff had disabilities, yet never engaged Plaintiff regarding those disabilities.

231.   Plaintiff notified all Defendants about his disabilities.  Defendants never returned any formal or informal response, information, or communication regarding those disabilities, and never accommodated Plaintiff.

232.   Defendant Groves violated the New York City Human Rights Law when he failed to engage in cooperative discussions to learn more about Plaintiff's disability and requested accommodations.

## SIXTEENTH CLAIM

**Failure to Accommodate by Failing to Engage in Cooperative Discussions over Plaintiff's Disabilities in Violation of the New York City Human Rights Law**

233.   Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

234.   Plaintiff is disabled within the meaning of §8-102(16) of the New York City Human Rights Law.

235.   Defendant Long knew of Plaintiff's need and request for an accommodation, but failed to fulfill her duty to provide such reasonable accommodation, or to engage in any cooperative discussions regarding those disabilities.

236.   Plaintiff requested accommodations for his Attention Deficit Hyperactivity Disorder and hearing loss, by requesting debriefs after important meetings, from Defendant Long.

237.   Defendant Long summarily failed to accommodate Plaintiff's request for an accommodation by failing to engage the interactive process.

238.   Defendant Long was required to provide Plaintiff a written final determination regarding his disability accommodations, yet failed to do so.

239.     Defendant Meta's managers and high-level workers, Defendant Brian Groves, and Defendant Ajaa Long were blatantly aware of Plaintiff's disabilities, yet no Defendant ever made any formal move to engage the interactive process regarding Plaintiff's disabilities.

240.     Plaintiff notified all Defendants about his disabilities.  Plaintiff notified Defendant Long about his disabilities at the beginning of their work relationship in or around April 2020. Defendants never returned any formal or informal response, information, or communication regarding those disabilities, and never accommodated Plaintiff.

241.     Defendant Long violated the New York City Human Rights Law when she failed to engage in cooperative discussions to learn more about Plaintiff's disability and requested accommodations.

## SEVENTEENTH CLAIM

**Hostile Work Environment on the Basis of Race and National Origin Discrimination Under Title VII**

242.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

243.     Plaintiff was subjected to hostile treatment at work on account of his race and national origin.

244.     Plaintiff was born in Peru.

245.     Plaintiff's supervisors, like Ajaa Long, told Plaintiff that she could not understand him, implying that she could not understand him because of his accent, and would grow visually frustrated because of that accent.

246.     Long and other supervisors impeded Plaintiff's work abilities, and overly criticized him at work because of his race and national origin, and, specifically, complained about his accent.

247.    Had plaintiff not been Latin, he would not have had his speech criticized and his speech would not have been a point of contestation frequently used against him.

248.    Furthermore, had Plaintiff not been of Latin origin, his managers would not have treated him with less respect than his peers, notably, they would not have heavily criticized his personality as "loud, intense, and abrasive."

249.    As such, Defendant Meta permitted and perpetuated a work environment hostile to Plaintiff's protected status as a Peruvian Latino.

## EIGHTEENTH CLAIM

**Hostile Work Environment on the Basis of Race and National Origin Discrimination Under New York State Human Rights Law**

250.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

251.    Plaintiff was subjected to hostile treatment at work on account of his race and national origin in violation of §296 of the New York State Human Rights Law.

252.    Plaintiff was born in Peru.

253.    Plaintiff was frequently ridiculed for his accent and speech.

254.    Plaintiff's supervisors, like Ajaa Long, told Plaintiff that she could not understand him, implying that she could not understand him because of his accent, and would grow visually frustrated because of that accent.

255.    Long and other supervisors impeded Plaintiff's work abilities, and overly criticized him at work because of his race and national origin, and, specifically, complained about his accent.

256.    Had plaintiff not been Latin, he would not have had his speech criticized and his speech would not have been a point of contestation frequently used against him.

257.     Furthermore, had Plaintiff not been of Latin origin, his managers would not have treated him with less respect than his peers, notably, they would not have heavily criticized his personality as "loud, intense, and abrasive."

258.     As such, Defendant Meta permitted and perpetuated a work environment hostile to Plaintiff's protected status as a Latino.

## NINETEENTH CLAIM

**Hostile Work Environment on the Basis of Race and National Origin Discrimination Under New York City Human Rights Law**

259.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

260.     Plaintiff was subjected to hostile treatment at work on account of his race and national origin within the meaning of New York City Administrative Code § 8–107(a)(1), (6), and (7).

261.     Plaintiff was born in Peru.

262.     Plaintiff's supervisors, like Ajaa Long, told Plaintiff that she could not understand him, implying that she could not understand him because of his accent, and would grow visually frustrated because of that accent.

263.     Long and other supervisors impeded Plaintiff's work abilities, and overly criticized him at work because of his race and national origin, and, specifically, complained about his accent.

264.     Had plaintiff not been Latin, he would not have had his speech criticized and his speech would not have been a point of contestation frequently used against him.

265.     Furthermore, had Plaintiff not been of Latin origin, his managers would not have treated him with less respect than his peers, notably, they would not have heavily criticized his personality as "loud, intense, and abrasive."

266. In or around September 2020, Long told Salem, "I cannot understand you," implying that she could not understand Salem because of his accent.

267. In October 2020, Long stated that "meetings with the ELC team are always so intense," and asked Salem, "Why are you so intense?"

268. As such, Defendant Meta permitted and perpetuated a work environment hostile to Plaintiff's protected status as a Latino.

## TWENTIETH CLAIM

### Hostile Work Environment on the Basis of Race and National Origin Discrimination Under New York City Human Rights Law

269. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

270. Plaintiff was subjected to hostile treatment at work on account of his race and national origin within the meaning of New York City Administrative Code § 8–107(a)(1), (6), and (7).

271. Plaintiff was born in Peru.

272. Plaintiff's supervisor, Ajaa Long, frequently told Plaintiff that she could not understand him, implying that she could not understand him because of his accent, and would grow visually frustrated because of that accent.

273. Long's supervisor, Defendant Groves, never intervened on Salem's behalf and allowed him to be subjected to a hostile work environment on account of his race and national origin.

274. Defendants Long and Groves impeded Plaintiff's work abilities, and overly criticized him at work because of his race and national origin, because of his accent.

275. Had plaintiff not been Latin, he would not have had his speech criticized and his speech would not have been a point of contestation frequently used against him.

276. Furthermore, had Plaintiff not been of Latin origin, his managers would not have treated him with less respect than his peers, notably, they would not have heavily criticized his personality as "loud, intense, and abrasive."

277. As such, Defendant Groves permitted and perpetuated a work environment hostile to Plaintiff's protected status as a Latino.

**TWENTY-FIRST CLAIM**

**Hostile Work Environment on the Basis of Race and National Origin Discrimination Under New York City Human Rights Law**

278. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

279. Plaintiff was subjected to hostile treatment at work on account of his race and national origin within the meaning of New York City Administrative Code § 8–107(a)(1), (6), and (7).

280. Plaintiff was born in Peru.

281. Plaintiff's supervisor, Ajaa Long, frequently told Plaintiff that she could not understand him, implying that she could not understand him because of his accent, and would grow visually frustrated because of that accent.

282. Long and other supervisors impeded Plaintiff's work abilities, and overly criticized him at work because of his race and national origin, and, specifically, complained about his accent.

283. Had plaintiff not been Latin, he would not have had his speech criticized and his speech would not have been a point of contestation frequently used against him.

284.     Furthermore, had Plaintiff not been of Latin origin, his managers would not have treated him with less respect than his peers, notably, they would not have heavily criticized his personality as "loud, intense, and abrasive."

285.     As such, Defendant Long permitted and perpetuated a work environment hostile to Plaintiff's protected status as a Latino.

**<u>TWENTY-SECOND CLAIM</u>**

**Hostile Work Environment on the Basis of Disability under the Americans with Disabilities Act**

286.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

287.     The Americans with Disabilities Act prohibits employers from perpetuating or permitting a work environment hostile to someone because of their status as disabled.

288.     Plaintiff is disabled within the meaning of the Americans with Disabilities Act.

289.     Defendant Meta's employees permitted or perpetuated a work environment hostile to Plaintiff.

290.     Specifically, Defendant Meta's employees would continuously criticize Plaintiff's personality because of issues underlying his disabilities.

291.     Had Defendant Meta respected Plaintiff's status as disabled, and Defendant Meta's employees were aware of the nature and extent of Plaintiff's disabilities, he would not have been harassed and targeted as someone "loud, intense, and abrasive."

## TWENTY-THIRD CLAIM

### Hostile Work Environment on the Basis of Disability under the New York State Human Rights Law

292.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

293.    The New York State Human Rights Law prohibits employers from perpetuating or permitting a work environment hostile to someone because of their status as disabled.

294.    Plaintiff is disabled within the meaning of the Americans with Disabilities Act.

295.    Defendant Meta's employees permitted or perpetuated a work environment hostile to Plaintiff.

296.    Specifically, Defendant Meta's employees would continuously criticize Plaintiff's personality because of issues underlying his disabilities.

297.    Had Defendant Meta respected Plaintiff's status as disabled, and Defendant Meta's employees were aware of the nature and extent of Plaintiff's disabilities, he would not have been harassed and targeted as someone "loud, intense, and abrasive."

## TWENTY-FOURTH CLAIM

### Hostile Work Environment on the Basis of Disability under the New York City Human Rights Law

298.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

299.    The New York City Human Rights Law imposes individual liability onto employees when they aid or abet discriminatory actions against a Plaintiff.

300.     Plaintiff's former supervisor, Brian Groves, is liable for subjecting Plaintiff to a hostile work environment on the basis of disability under the New York State Human Rights Law and New York City Human Rights Law.

301.     Defendant Groves' mistreatment, hostility, and failure to accommodate Plaintiff's disability aided and abetted discrimination against Plaintiff.

## TWENTY-FIFTH CLAIM

**Hostile Work Environment on the Basis of Disability under the New York City Human Rights Law**

302.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 108 with the same force as though separately alleged herein.

303.     The New York City Human Rights Law imposes individual liability onto employees when they aid or abet discriminatory actions against a Plaintiff.

304.     Plaintiff's former supervisor, Ajaa Long, is liable for subjecting Plaintiff to a hostile work environment on the basis of disability under the New York State Human Rights Law and New York City Human Rights Law.

305.     Defendant Long's mistreatment, hostility, and failure to accommodate Plaintiff's disability aided and abetted discrimination against Plaintiff.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

B.  for the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

C.  for the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

D.  for the fourth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

E.  for the fifth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

F.  for the sixth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

G.  for the seventh cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

H.  for the eight cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

I.  for the ninth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

J.  for the tenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

K.  for the eleventh cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

L.  for the twelfth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

M.  for the thirteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

N.  for the fourteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

O.  for the fifteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

P.  for the sixteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

Q.  for the seventeenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

R.  for the eighteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

S.  for the nineteenth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

T.  for the twentieth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

U.  for the twenty-first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

V.  for the twenty-second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

W.  for the twenty-third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

X.  for the twenty-fourth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars;

Y.  for the twenty-fifth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, but no less than one million dollars; and

Z.  For such other and further relief as the Court deems just and proper.


Dated:  New York, New York
        February 8, 2022

THE HARMAN FIRM, LLP

By:  _____

        Walker G. Harman, Jr.
        244 Fifth Ave., Suite H211
        New York, NY 10001
        (646) 248-2288
        wharman@theharmanfirm.com
        *Attorney for Plaintiff*